FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2018 FEB 16  AM 11: 51

CLERK'S OFFICE
AT GREENBELT

BY _____ BU _____ DEPUTY

**UNITED STATES DISTRICT COURT FOR**
**DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA *ex rel.*
[SEALED],

      Plaintiff and Relator,

v.

[SEALED]

      Defendants.

Case No.

PWG 18 CV 0486

**FILED UNDER SEAL**

*Jury Trial Demanded*

**DO NOT FILE WITH PACER**

**COMPLAINT**

**UNITED STATES DISTRICT COURT FOR**
**DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA *ex rel.*
CONNIE EZERSKI,

   Plaintiff and Relator,

v.

CTIS, INC., RAJ SHAH, BHARTI SHAH,
NUPUR RIVERA, SUNITA SHAH-WALTER,
RINA SHAH, MITEN SHAH, AND JOHN
RUFFIN

   Defendants.

Case No.

**PWG 18 CV 0486**

**FILED UNDER SEAL**

*Jury Trial Demanded*

**DO NOT FILE WITH PACER**

## COMPLAINT

### I. INTRODUCTION

 1. Qui tam Relator Connie Ezerski ("Relator" or "Ezerski") brings this action on her behalf and on behalf of the United States of America ("United States" or "the Government") to recover civil damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("the FCA" or "the Act"), against Defendants, CTIS, Inc. ("CTIS"); Raj Shah, Bharti Shah, Nupur Rivera, Sunita Shah-Walter, Rina Shah, and Miten Shah, ("the Shahs"); and John Ruffin (collectively, "the Defendants").

 2. For years, the Shahs have exploited health-related, cost-reimbursement contracts with the United States to finance their exorbitant and lavish lifestyles at taxpayers' expense. The Shahs have done so by knowingly submitting false claims for payments to the Government or making false statements material to false claims, in part by disguising their personal, lifestyle expenses as direct or indirect costs incurred by CTIS that were then passed along to the Government through cost-reimbursement requests.

1

3.       As a result of this scheme, the Government has unknowingly paid for, among

other items, luxury cars, family vacations, country club memberships, campaign contributions,

mortgages on two homes, salaries for phantom employees, and a six-figure wedding. None of

these items were allowable costs under any contract, which is why the Shahs, through CTIS,

intentionally disguised them as "direct or indirect" costs.

4.       The Shahs also used shell, pass-through companies to create illegal profits over

and above the fixed fees that CTIS was entitled to under the relevant contracts. The Shahs

established, and through CTIS, subcontracted with, these shell companies, ostensibly to perform

work in support of CTIS's government contracts. In reality, the tasks for which the shell

companies billed CTIS—if legitimate at all—had already been, or would be, performed and

completed by CTIS employees. The Shahs then created fictitious and fraudulent invoices from

the shell companies, and passed those costs along to the Government through CTIS.

5.       In addition, in at least one instance, the Shahs acquired federal funding by

fraudulently inducing the Government to award CTIS a $15 million grant. The Shahs secured

this award by bribing then-Director of the National Institute on Minority Health and Health

Disparities ("NIMHD"), Dr. John Ruffin, with the promise of post-government employment that

would be funded by the grant. Months after being awarded the grant, CTIS retained Dr. Ruffin's

consulting company, and Dr. Ruffin drew a six-figure consulting fee directly from the grant

funds despite performing no work in support of the grant.

6.       These knowingly false and fraudulent claims by the Defendants damaged the

United States Government and violated the False Claims Act.

**II.      PARTIES**

7.       Relator Connie Ezerski is an American citizen, domiciled in the state of

Maryland.

2

8.      On or about March 2017, Ms. Ezerski voluntarily, and in good-standing, left her eighteen-year employment with Defendant CTIS.

9.      Her most recent title at CTIS was Vice President of Corporate Services, a title which she held since 2015.

10.     Prior to that position, Ms. Ezerski served as an executive assistant to Raj Shah.

11.     At all relevant times, her responsibilities included, but were not limited to, supporting company contracts, reviewing employee timecards, scheduling and organizing travel arrangements for Raj and Bharti Shah, and attending to personal items for Raj and Bharti Shah.

12.     After her promotion to Vice President, Ms. Ezerski also acquired signing authority on behalf of CTIS.  Through this authority, Ms. Ezerski could, and did, execute contracts on behalf of the company, including contracts with the Government.

13.     By virtue of her employment duties with CTIS, Ms. Ezerski has direct, personal knowledge of the Defendants' contract, government billing, and financial practices.

14.     Ms. Ezerski voluntarily ended her employment at CTIS due to her discomfort with the Defendants' fraudulent activities.

15.     Defendant CTIS is a privately-held, Maryland corporation with a principal place of business in One Research Court, Suite 200, Rockville, Maryland in Montgomery County.

16.     CTIS is a health-based, information technology ("IT") company, which holds several cost-reimbursement contracts with, and at least one grant from, the United States.

17.     Virtually all of CTIS's revenue is earned through cost-reimbursement, federal government contracts (and at least one grant) from health agencies.  Through these vehicles, CTIS routinely generates revenues between $10 and $20 million annually since 2002.

3

18.     Defendant Raj Shah is an owner and the Chairman and Chief Executive Officer ("CEO") of CTIS.

19.     He holds a bachelor's degree in chemistry and physics from Bombay University, a master's degree in chemistry from University of Detroit, and advanced training from the University of Chicago and Harvard Business School.

20.     Raj Shah is a citizen of, and domiciled in, the commonwealth of Virginia, and routinely conducts business in the state of Maryland at One Research Court, Suite 200, Rockville, Maryland in Montgomery County.

21.     Raj Shah is also married to Defendant Bharti Shah.

22.     Defendant Bharti Shah is an owner, Member of the Board of Directors, Deputy CEO, and Chief Empowerment Officer of CTIS.

23.     She has a bachelor's degree in commerce and economics from Mumbai University and has a Montessori teacher training and certification from the Institute for Advanced Montessori Studies' Barrie School.

24.     Bharti Shah is a citizen of, and domiciled in, the commonwealth of Virginia, and routinely conducts business in the state of Maryland at One Research Court, Suite 200, Rockville, Maryland in Montgomery County.

25.     Together, Raj and Bharti Shah are majority owners of CTIS.

26.     Defendant Nupir Rivera is the daughter of Raj and Bharti Shah.

27.     She is a nurse practitioner.

28.     She holds a bachelor's degree in nursing from the George Washington University.

4

29.    She is a citizen of, and domiciled in, the state of Georgia, but formerly conducted business in the state of Maryland at One Research Court, Suite 200, Rockville, Maryland in Montgomery County.

30.    Defendant Sunita Shah-Walter is also the daughter of Raj and Bharti Shah.

31.    She is the Vice President of the Emerging Strategic Business Unit at CTIS.

32.    She holds a bachelor's degree from Columbia University, a master's degree from the University of Michigan College of Engineering, and a master's degree and a doctoral degree from Harvard University.

33.    She is a citizen of, and domiciled in, the commonwealth of Virginia, and routinely conducts business in the state of Maryland at One Research Court, Suite 200, Rockville, Maryland in Montgomery County.

34.    Defendant Rina Shah is also the daughter of Raj and Bharti Shah.

35.    She is unemployed and receives disability from the military.

36.    She is a citizen of, and domiciled in, the commonwealth of Virginia.  She formerly conducted business in the state of Maryland at One Research Court, Suite 200, Rockville, Maryland in Montgomery County.

37.    Defendant Miten Shah is Raj Shah's nephew.

38.    At all relevant times, Miten Shah served as accountant for CTIS.

39.    He is a citizen of, domiciled in, and routinely conducts business in the state of Maryland at One Research Court, Suite 200, Rockville, Maryland in Montgomery County.

40.    Defendant John Ruffin is the former Director of NIMHD.

41.    Dr. Ruffin is presently retired.

5

42. He is a citizen of, and domiciled in, the state of Maryland, where, at all relevant times, he routinely conducted business with Defendant CTIS in the state of Maryland at One Research Court, Suite 200, Rockville, Maryland in Montgomery County.

## III.   JURISDICTION AND VENUE

43. This Court has subject-matter jurisdiction pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1331. Section 3732 confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729-3730.

44. This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because at least one of the Defendants can be found in, resides or transacts, or has transacted business in this District.

45. Venue is proper in this District under 31 U.S.C. § 3732(a) because at least one Defendant in this action can be found in or transacts or has transacted business in this District. Further, venue is appropriate because a substantial part of the events or omissions giving rise to the claim occurred in this District.

46. The facts and circumstances of the False Claims Act violations alleged in this complaint have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or Government Accountability Office report, hearing, audit, or investigation, nor in the news media.

47. Under 31 U.S.C. § 3730(e), Ms. Ezerski qualifies as an original source because she has independent knowledge of the allegations in this complaint. Ms. Ezerski voluntarily disclosed those allegations to the United States prior to filing.

## IV.   FACTUAL AND LEGAL BACKGROUND

48. CTIS's revenue derives almost exclusively from contracts with, and at least one grant from, the National Institutes of Health ("NIH" or "Agency").

6

49.     NIH, part of the United States Department of Health and Human Services, is the nation's medical research agency.

50.     The Agency conducts research on the nature and behavior of living systems and applies the results of that research to enhance human health, lengthen life, and reduce illness and disability.  While NIH achieves these goals in part through its own research facilities, the vast majority of NIH's budget—more than 80%—is devoted to achieving these goals through public-private contracts and competitively awarded grants.

51.     NIH awards these contracts and grants to private institutions on the strength of their proposals or applications.  Those proposals and applications are evaluated to determine how well the private institution can assist NIH in achieving its critical health-related goals.

**A.      CTIS's Cost-Reimbursement Contracts with NIH**

52.     For over a decade, CTIS has held multiple contracts with NIH to assist it in advancing its critical health-related goals.  One program NIH administers to further its goals is the Cancer Therapy Evaluation Program ("CTEP").  Through CTEP, NIH devotes public funds to an extensive national program of cancer research and clinical trials to evaluate new anti-cancer agents.

53.     On or about July 11, 2012, NIH awarded contract number HHSN316201200124W to CTIS for IT and Telecom solutions.  The contract was a multiple-award, indefinite-delivery/indefinite-quantity contract, set aside for small businesses.  CTIS was one of approximately 150 awardees, and the overall contract ceiling for all awardees was $20 billion.

54.     The contract was an umbrella contract, meaning that NIH anticipated issuing task orders under the contract to its contracting partners for specific services.  Pricing was order-dependent.

7

55.     Under the umbrella contract, on September 10, 2015, NIH issued task order HHSN26100001 to CTIS to provide development, enhancement, maintenance, and integration support to NIH for CTEP ("CTEP Task Order").

56.     The CTEP Task Order had a base period of performance of one year, and six one-year option periods, for a total period of performance of seven years.

57.     The CTEP Task Order was a cost-plus-fixed-fee—*i.e.*, cost reimbursement—contract.

58.     This contract type provided that NIH would reimburse CTIS for certain allowable expenses incurred during performance through cost-reimbursement submissions, and NIH would also pay CTIS a fixed fee, representing CTIS's profit under the contract.  NIH would recover its allowable costs by periodically submitting invoices outlining those costs to the Government.

59.     The total estimated cost for all seven years was $14,171,697, and the fixed fee for the same period was $673,156.

60.     CTIS could not recover all costs it incurred in support of the CTEP Task Order. CTIS was only entitled to recover the costs that were allowable under the terms of the Task Order, one of which was Federal Acquisition Regulation ("FAR") 52.216-7, Allowable Cost and Payment.

61.     FAR 52.216-7 incorporates the cost principles in FAR Part 31.

62.     FAR Part 31 defines allowable costs as those that are both ***reasonable*** and ***allocable*** to a contract.

63.     The FAR defines a cost as reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business.

8

64.     The FAR defines a cost as allocable if it is (1) incurred specifically for the contract (a direct cost), (2) benefits both the contract and other work (an indirect cost), or (3) is necessary to the overall operation of the business (an indirect cost).

65.     Certain types of costs are always unallowable under the FAR Part 31 cost principles.  Examples of costs that are always unallowable include:

- Costs of amusement, diversions, social activities, and any directly associated costs such as tickets to shows or sports events, meals, lodging, rentals, transportation, and gratuities, FAR 31.205-14;

- Costs of membership in social, dining, or country clubs or other similar organizations, *id.*; and

- Attempts to influence the outcomes of any Federal, State, or local election, referendum, initiative, or similar procedure, through in-kind or cash contributions, FAR 31.205-22.

66.     The CTEP Task Order also expressly deemed certain other costs as unallowable. For instance, CTIS could not claim acquisition of any property interest, consultant costs, foreign travel, or subcontracts, among others, as direct costs under the Task Order.

67.     The CTEP Task Order allowed CTIS to recover indirect costs in the form of overhead, general & administrative ("G&A") expenses, and fringe benefits.

68.     The CTEP Task Order also contained various data security requirements. Specifically, and at a minimum, CTIS was required to adopt and implement "the policies, procedures, controls and standards of the HHS Information Security Program[.]"

9

69.     The HHS Information Security Program outlines detailed technical specifications that apply to any electronically stored sensitive information, such as protected health information, to ensure that the sensitive information is adequately protected.

70.     Prior to being awarded the CTEP Task Order, and dating back to 2002, CTIS held other cost-type contracts with NIH.  These contracts contained similar terms, allowing CTIS to recover allowable costs, including indirect costs, incurred as a result of performance.

71.     CTIS's other cost-reimbursement contracts with NIH included the following:

Contract No. HHSN261200900008C

Contract No. HHSN261200522011C

Contract No. N02CM52211

Contract No. 00266200309D266030060

Contract No. 261024005

Contract No. N02CM27021

Contract No. 261024004

**B.     CTIS's NIH Grant**

72.     NIH also administers grants.

73.     On or about July 6, 2012, one component of NIH, NIMHD, posted RFA-MD-12-007, a notice of intent to award a $15 million grant to establish specialized Transdisciplinary Collaborative Centers for health disparities research ("TCC Grant").

74.     NIMHD intended to disburse the TCC Grant funds in annual increments of $3 million over a period of five years.

75.     On or about November 16, 2012, it reissued the TCC Grant notice through RFA-MD-13-003.

10

76.     The Grant required applicants to protect sensitive information, such as protected health information, in accordance with the Health Insurance Portability and Accountability Act ("HIPAA") and the HIPAA Privacy Rule.  The HIPAA Privacy Rule requires contractors to employ reasonable safeguards to protect sensitive information, such as implementing policies and procedures to govern that information's use, storage, and access.

77.     CTIS submitted an application for the TCC Grant on or about January 15, 2013.

78.     After conducting scientific and technical merit evaluations of all submissions, NIMHD awarded the TCC Grant to CTIS.

## V.     THE DEFENDANTS' FRAUD

79.     Both the CTEP Contract and TCC Grant were developed by NIH to address serious health concerns: combating cancer and addressing health disparities that afflict minorities.

80.     Similarly, CTIS's prior cost-type contracts with NIH were also designed to assist NIH in addressing serious health-related issues, such as AIDS research.

81.     Virtually all of the Defendants' incomes—and CTIS's revenues—are generated from CTIS's cost-reimbursement contracts and/or the TCC Grant.

82.     By accepting the awards of those funding vehicles, CTIS promised to support NIH's efforts to address its health-related goals.

83.     Instead, the Defendants exploited those funding vehicles to finance lavish lifestyles for the Shahs and their friends.  The Defendants did so by knowingly submitting false and fraudulent claims or false statements material to false claims to the Government.

11

**A.    The Shahs, Through CTIS, Systematically Violated the False Claims Act by Submitting False or Fraudulent Reimbursement Requests to the Government for Unallowable Costs.**

84.    The Shahs developed and carried out a scheme to recover unallowable costs from the United States by knowingly and intentionally disguising unallowable expenses as "direct and indirect costs" in CTIS's invoices to the Government.

85.    The Shahs knowingly charged unallowable costs first to CTIS as G&A, overhead, or fringe costs. Raj and Bharti Shah then knowingly caused CTIS to submit false or fraudulent invoices to the Government, claiming reimbursement for the G&A, overhead, and fringe, which the Government would pay.

86.    The Shahs, through CTIS, intentionally hid the expenses in the indirect cost reimbursement requests, knowing that they were unallowable expenses that the Government would not pay if it were aware of their true nature. On the face of CTIS's invoices claiming indirect costs, it appeared to the Government that it was paying legitimate G&A, overhead, and fringe costs, rather than subsidizing the Shahs' luxurious lifestyle. Upon information and belief, the Government has never audited CTIS, such that it might have been aware of the Shahs' and CTIS's false or fraudulent claims.

87.    Because virtually all of CTIS's revenue is derived from its cost-reimbursement contracts, virtually all of its indirect costs are eventually borne by the Government.

88.    The Shahs, through CTIS, also charged unallowable direct costs to the Government. They did so by knowingly and intentionally disguising reimbursements for personal expenses as allowable direct costs that could be charged to the Government, such as mileage reimbursements.

89.    The Defendants knowingly and falsely certified in each of their cost reimbursement submissions that their charges to their government contracts or the TCC Grant

12

consisted only of allowable costs. These certifications were knowingly false because the Shahs and CTIS knew that the cost reimbursement submissions disguised unallowable costs as sham direct costs or indirect costs.

> ### a. The Shahs, Through CTIS, Knowingly and Fraudulently Charged the Government for Unallowable Personal Expenses and Campaign Contributions.

90. From at least 2009, and continuing to the present, Raj and Bharti Shah defrauded the Government by knowingly seeking, through CTIS, reimbursement of personal expenses that were otherwise unallowable under CTIS's contracts and disguising them as indirect costs. Raj and Bharti Shah knew that these personal expenses were unallowable costs because they are not allocable to any CTIS contracts with NIH and would not be incurred by a prudent person running a competitive business. Further, many of the personal expenses claimed by CTIS and the Shahs are expressly unallowable under the terms of CTIS's contracts with NIH.

91. Acting at the direction of Raj Shah, CTIS hid these costs by charging them to the company as either G&A, overhead, or fringe. Raj Shah knowingly and intentionally concealed these costs as indirect costs, because he knew that the Government would not pay them if they were claimed directly or were accurately described in the CTIS invoices.

92. For instance, for many years, Raj Shah's personal car was a $345,000 Maybach, which he expensed to CTIS as an indirect cost. By 2013, Raj Shah "downgraded" to a Mercedes, which is valued at $100,000, and was also expensed to the company as an indirect cost.

93. Raj Shah knew that these luxury cars—which were neither reasonable nor allocable to CTIS's contracts with NIH—were not allowable costs, but nonetheless knowingly charged them to CTIS as G&A or overhead. He did so knowingly, and with the intent, that these expenses would ultimately be borne by the Government when CTIS invoiced the Government for G&A, overhead, and fringe.

13

94.     When CTIS submitted, and the Government paid, CTIS's cost-reimbursement requests for G&A and overhead, these requests improperly included the cost of Raj Shah's luxury cars. These claims were knowingly false claims because CTIS, at the direction of Raj Shah, intentionally failed to disclose the material fact that CTIS's indirect costs included the unallowable cost of Raj Shah's luxury cars.

95.     CTIS also paid for Raj Shah's two mortgages for his personal residences, including his home in Leesburg, Virginia. The monthly mortgage payment for the Leesburg home was over $5,000, and his second mortgage payment exceeded $2,000 per month. Raj Shah referred to the mortgage payment on his Leesburg personal residence as "Virginia Office rent" when charging it to CTIS as an indirect cost. In fact, CTIS's work is only performed out of its actual office located at One Research Court, Suite 200, Rockville, MD 20850.

96.     Raj Shah's knew his personal mortgage payments were expressly unallowable costs under the CTEP Task Order, which prohibited costs related to acquisition of any real property interest.

97.     CTIS, acting at the direction of Raj Shah, knowingly and intentionally caused the Government to pay these expressly unallowable costs by presenting them in invoices to the Government as indirect costs and failing to disclose the material fact that the indirect costs included the costs of Raj Shah's two mortgages.

98.     Raj Shah similarly charged CTIS for, among other personal expenses, his personal drivers, housekeeper, gardener, country club memberships, and three credit cards, one of which incurred annual charges of approximately $90,000. CTIS absorbed these unallowable costs as G&A, overhead, and fringe. Those unallowable costs were then also falsely or

14

fraudulently passed along to the Government in invoices and expense reports claiming them as indirect costs.

99.     CTIS kept scrupulous records documenting Raj and Bharti Shah's personal expenses that were improperly absorbed by the company as indirect costs. After each fiscal year, Raj and Bharti Shah received a summary of their expenses that year that CTIS absorbed as indirect costs.

100.    For example, on or about October 27, 2014, Miten Shah—Raj Shah's nephew and CTIS's accountant—circulated the below spreadsheet outlining Raj Shah's personal expenses charged to CTIS that fiscal year.

|  | Monthly | Yearly |
|---|---|---|
| 1st Mortgage | 5,200.00 | 62,400.00 |
| 2nd Mortgage | 2,000.00 | 24,000.00 |
| The Town Of Leesburg Virginia | 300.00 | 3,600.00 |
| Washington Gas | 200.00 | 2,400.00 |
| Dominion VA Power | 350.00 | 4,200.00 |
| Satellite Industries | 150.00 | 300.00 |
| River Creek Asso. | 175.00 | 2,100.00 |
| Verizon | 700.00 | 8,400.00 |
| American Express | 7,500.00 | 90,000.00 |
| Wachovia Bank | 3,000.00 | 36,000.00 |
| Citi Card (Reward Card) - Master Card Simplicity | 5,000.00 | 60,000.00 |
| Misc | 3,500.00 | 42,000.00 |
| Auto | 925.00 | 11,100.00 |
| Auto Insurance | 450.00 | 5,400.00 |
| Bug Buster | 425.00 | 1,275.00 |
| Property Services | 135.00 | 1,350.00 |
| Metlife | 1,300.00 | 15,600.00 |
| Mass Mutual | 1,400.00 | 16,800.00 |
| Mass Mutual | 1,400.00 | 16,800.00 |
| Medicare | 250.00 | 3,000.00 |
| Phone | 750.00 | 9,000.00 |
| Tower Club | 250.00 | 3,000.00 |
| River Club | 125.00 | 1,500.00 |
| Alba | 2,000.00 | 24,000.00 |
| Alba - Expenses | 1,500.00 | 18,000.00 |
| Kris Dann | 2,500.00 | 30,000.00 |
| Tower Club | 250.00 | 3,000.00 |
| River Club | 125.00 | 1,500.00 |

Monthly Total    41,860.00

Yearly Total   502,320.00

101.    For Raj Shah alone, exclusive of salary, those personal expenses in 2014 totaled over $500,000.

102.    All of those expenses were absorbed by CTIS as either G&A, overhead, or fringe, and were in turn passed along to the Government as indirect costs in CTIS's cost reimbursement submissions.

16

103.    All of those expenses were unallowable costs because they were not reasonable or allocable to the CTEP Task Order.  Some, such as the mortgages and the club memberships, were expressly unallowable.  Nonetheless, CTIS, acting at the direction of Raj Shah, knowingly and intentionally caused the Government to pay those costs by concealing them as indirect costs in CTIS's invoices to the Government.

104.    On or about October 6, 2016, Miten Shah prepared another spreadsheet outlining the Shahs' personal expenses that CTIS reimbursed in the prior fiscal year.

105.    In that year, the Shahs ran up personal expenses charged to CTIS of approximately $1.72 million.  These expenses did not include the salaries CTIS paid the Shahs.

106.    Per the Shahs' regular practice, these unallowable expenses were absorbed by CTIS as G&A, overhead, or fringe, and then passed along in part to the Government under the Contract's reimbursement for indirect costs.

107.    Raj Shah employed a similar scheme to use CTIS funds to make campaign contributions to favored candidates and political action committees, which were passed on to the Government.

108.    Raj Shah ordered various employees, including Ms. Ezerski, to make contributions to organizations such as AmeriPAC, which CTIS would reimburse through fabricated travel expense reports.

109.    After twice being forced to make political contributions against her will, Ms. Ezerski refused Raj Shah's subsequent requests.

110.    Nonetheless, Raj Shah continued this practice with other CTIS employees.

111.    Campaign contributions are expressly unallowable costs.

17

112.     In total, Raj Shah arranged for over $50,000 in campaign contributions through various CTIS employees, who were later reimbursed by CTIS via phony travel expense reports. Those reimbursements were absorbed as indirect costs for CTIS and passed along to the Government, even though CTIS and Raj Shah knew that campaign contributions were expressly unallowable.

113.     All of the above expenses are unallowable costs under CTIS's contracts with NIH. Raj and Bharti Shah knew that the costs were unallowable and that the Government would not reimburse them unless they were concealed in CTIS invoices as indirect costs.

> **b.**     **The Shahs, through CTIS, Knowingly and Fraudulently Charged the Government for False Travel Expenses to Obtain Reimbursement of Funds Confiscated from CTIS Employees.**

114.     Raj and Bharti Shah also devised a scheme to further conceal their overcharges by ordering CTIS employees to withdraw money from their personal accounts for Raj and Bharti Shah's personal use, which CTIS would later reimburse as "mileage" for trips that never occurred. At Raj Shah's direction, Miten Shah fabricated travel expense reports for the relevant employees to cover the amount fronted by the employee.

115.     Raj Shah caused these reimbursements to be billed as "mileage" so as to conceal the true origin and nature of those costs from the Government. He then caused CTIS to pass these fictitious mileage reimbursements to the Government.

116.     For example, Bharti Shah had a personal, cash-on-hand requirement of $1,500.

117.     When she fell below that amount, Raj Shah would instruct employees to withdraw funds from their personal bank accounts to meet her cash-on-hand requirement.

118.     Then, at Raj and Bharti Shah's direction, Miten Shah would forge travel expense reports for the relevant employee in the same amount. CTIS would then reimburse the employee

in the next pay period for "mileage" expenses from trips that never occurred, absorbing the expense as an indirect cost.

119.    Those mileage expenses were passed along to the Government through cost-reimbursement submissions as an indirect cost.  While mileage is an allowable indirect cost, all invoices containing indirect costs were knowingly false because they included mileage for trips that never occurred and instead were intentionally designed by Raj and Bharti Shah and CTIS to conceal the submission of unallowable costs to the Government.

120.    In one such instance, in or around September 2016, Raj Shah's personal driver provided the Shahs over $1,100 from his personal account.

121.    Raj Shah's personal driver subsequently submitted a travel expense report for $1,116.72, which CTIS paid, purporting to cover 11 one-way, 94-mile trips to a gastroenterologist over the course of 15 days.

122.    In fact, Raj Shah's personal driver did not make 11 one-way visits to a gastroenterologist in 15 days, but instead was being reimbursed by CTIS for personally providing Raj and Bharti Shah with cash from his private bank account.

123.    The expense report was fabricated by Miten Shah at the direction of the Raj Shah, who caused CTIS to pass that fraudulent expense along to the Government.

124.    Raj Shah's earlier personal driver also covered the Shahs' personal expenses at their direction and was reimbursed through mileage.  On one occasion, he confided to Ms. Ezerski that his credit card bills were becoming too large and that he did not know if he could put in enough mileage reimbursements without it appearing obvious that they were fraudulent.

19

125. Upon information and belief, CTIS currently maintains extensive documentation of these "mileage" reimbursements—each of which are knowingly false statements that are material to CTIS's false claims.

### c. The Shahs, Through CTIS, Knowingly and Fraudulently Charged the Government for Phony "Corporate Retreats" That Were in Fact Shah Family Outings or Vacations.

126. CTIS, at the direction of Raj Shah, also billed Shah family outings or vacations to the Government. They did so by falsely labeling them as business events or "corporate retreats" and charging them to CTIS as indirect costs, which were then passed along to the Government, even though no CTIS work was performed on the family vacations. Raj Shah intentionally caused these to be labeled "corporate retreats" because family vacations are unallowable costs.

127. For example, in September 2014, CTIS issued a check to Elite Intense LLC in the amount of $18,000 for premium seats at what CTIS labeled a "Cancer & Chronic Disease event." This event was actually "SLAM! The Tour"—a Bollywood concert at Jiffy Lube Live in Bristow, Virginia held on September 21, 2014. Attendees included Bharti Shah, Nupur Shah, Rina Shah, and her husband.

128. On April 19, 2015, Raj Shah celebrated Bharti Shah's 60th birthday a lavish party at the Ritz Carlton in Tysons Corner, Virginia. Raj Shah arranged for this to be charged to CTIS, which was passed along to the Government.

129. In August 2015, and again in September 2017, Raj and Bharti Shah enjoyed Watermark cruises in Annapolis, Maryland, which were billed to CTIS and passed along to the Government.

130. The "corporate retreats" were also lavish. As an example, in September of 2016, Raj Shah arranged for a weekend vacation for the family at the $1,000 per night Lodge and

Cottages at Primland in the Blue Ridge Mountains in Meadows of Dan, Virginia. CTIS sought reimbursement for the expenses from the Government as indirect costs.

131.    On another occasion, Raj Shah arranged for CTIS to purchase his family's first-class, roundtrip tickets on the luxury airline Emirates, complete with a private pod. CTIS absorbed this expense as an indirect cost and submitted it to the Government for reimbursement.

132.    The Shahs did not always use commercial airlines. On at least five occasions, Raj Shah arranged for private jets for his family's trips, which CTIS also absorbed as an indirect cost for which it sought reimbursement from the Government. The private jet trips generally ranged between $16,000 and $17,000 per trip.

133.    Another corporate retreat was their youngest daughter's wedding at the Salamander Resort and Spa in Middleburg, Virginia, which cost approximately $150,000—paid for by CTIS and passed along to the Government.

134.    The Salamander is home to a 23,000-square-foot spa resting on 340 acres, 25 of which are dedicated to the Salamander's equestrian facilities, which include a riding area and a 14,000 square-foot stable. Raj and Bharti Shah paid to incorporate thoroughbreds into their daughter's wedding ceremony and reception.

135.    This wedding took place entirely at CTIS's expense, despite not relating in any way to the health-related research CTIS purportedly performed. Raj Shah directed that the wedding be charged to CTIS as a corporate retreat with the knowledge and intention that it would ultimately be passed along to the Government when CTIS submitted invoices for indirect costs even though it was obviously an unallowable cost.

136.    On or about October 30, 2015, Raj Shah received the wedding planner contract from his daughter, who asked if he was "ok with this[.]" Raj Shah instructed her to "[g]o ahead"

21

but to "[u]se everyone [sic] non CTIS email."  A few months later, the wedding planner advised the Shahs that, given the venue and the size of the wedding "[s]taying at $100,000 is going to be VERY tough!"

137.    CTIS, at Raj Shah's direction, knowingly and intentionally passed the cost of these phony retreats to the Government through CTIS's invoices claiming indirect costs.

### d.    The Shahs Ignored CTIS Employees Who Expressed Concern Regarding the Fraudulent Reimbursement Requests.

138.    The above fraudulent billing became a growing concern to other CTIS employees.

139.    On or about May 26, 2013, then-CTIS President Mehul Shah, Raj Shah's cousin, threatened to resign over the Defendants' billing practices.

140.    In an email to Raj Shah, Mehul Shah complained that he was being "used only as a front" to hide the ways that Raj Shah was exploiting the CTIS contracts to "strengthen[ his] financial position."

141.    Mehul Shah revealed that he had told his wife of the fraudulent billing practices. His wife was so "horrified with what has happened so far" that she threatened to "leave with the kids and go to India" rather than watch Mehul Shah "suffer and maybe end up in jail."

142.    Others also raised concerns.  On or about July 7, 2014, a CTIS consultant, conducted an audit of CTIS's indirect costs with the assistance of an auditing firm.

143.    The consultant informed Raj Shah that "many entries made in the past have been expensed incorrectly," including over $100,000 that Bharti Shah expensed as indirect costs that were in fact accounts receivable from related entities.  The consultant was terminated shortly thereafter.

144.    Upon information and belief, despite being informed that their billing practices were non-compliant, the Shahs, through CTIS, continued to pass along inflated and impermissible indirect costs to the Government.

145.    Ms. Ezerski became so concerned about the scope and seriousness of the fraudulent practices that she decided to seek other employment.

146.    She approached Robert Cone, a CTIS Board Member who was aware of the fraudulent practices, for a letter of recommendation.

147.    On or about October 9, 2016, Mr. Cone shared his draft letter with Ms. Ezerski.

148.    This letter, purporting to extol Ms. Ezerski's value as an employee, contained a thinly-veiled instruction to not disclose what she knew about the fraudulent practices.

149.    Mr. Cone's letter stated that Ms. Ezerski's most important quality was her "confidentiality." He went on to state that she has "been a confidant of the president [Raj Shah] for most of my time with the company and have been in on most of the confidential discussions at the board level and I know of no incidence [sic] where you have broken that confidence. That is a rare quality in business today."

150.    Ms. Ezerski understood the true message of the letter to be that she should not discuss with anyone CTIS's fraudulent business practices.

151.    On or about March 27, 2017, Ms. Ezerski submitted her letter of resignation from CTIS.

**B.      The Shahs, Through CTIS, Systematically Violated the False Claims Act by "Employing" Family Members and a Family Friend and Charging the Government for Work that Was Not Performed.**

          **a.      The Shahs, Through CTIS, Knowingly and Fraudulently Submitted False Timesheets to the Government for Raj and Bharti Shah for Work that Was Never Performed.**

152.    Raj Shah ensured that all of his immediate family had paid positions at CTIS, even though in many cases, they did not perform any work or even show up at the office.

153.    Bharti Shah was given the title of Deputy CEO and Chief Empowerment Officer and drew a salary that was charged to G&A or overhead—charges which were in turn passed along to the United States through reimbursement requests for indirect costs.

154.    Despite being paid for a full-time position, Bharti Shah had no actual job responsibilities and often would not even show up for work.  On average, Bharti Shah would only come into the office to "work" three days a week.

155.    Nonetheless, Raj Shah took steps to conceal the fact that Bharti Shah's "position" was fictitious.

156.    To create the illusion that Bharti Shah was a legitimate, full-time employee, Raj Shah would log in to their joint email account and send emails to company staff as Bharti Shah on many days in which she was absent.

157.    As this practice became more and more routine, senior CTIS staff who were aware of the Shahs' deceit would joke that Raj Shah was "wearing the skirt and lipstick today" when he was impersonating his wife through email.

158.    On some occasions, Raj Shah would slip and sign as himself on emails that otherwise purported to be from Bharti Shah.

159.    Raj Shah also arranged for his accounting staff to fabricate timesheets, stating that Bharti Shah worked forty hours in weeks that she did not.

160.     Miten Shah created timesheets stating that Bharti Shah worked eight hours a day, with no description of any task performed.

161.     These fictitious timesheets were charged to CTIS as G&A or overhead, which were then passed along to the Government as part of indirect costs in invoices to the Government on CTIS's contracts.

162.     Similarly, on days where Raj Shah did not work, Miten Shah nonetheless fabricated timesheets at Raj Shah's behest that falsely claimed that he worked eight hours those days.

163.     Raj Shah's fictitious timesheets were variously charged directly to the CTEP Task Order and the TCC Grant, as well as occasionally to G&A and overhead.

164.     Creating fictitious timesheets had the added benefit of preserving the Shahs' paid time off ("PTO")—a fringe benefit offered by CTIS that was also passed along to the Government as an indirect cost.

165.     CTIS employees were afforded a certain amount of PTO each year. Shah family members could also elect to "cash out" any unused PTO they had accrued.

166.     By creating fictitious timesheets, the Shahs were able to cash out 100% of their PTO every year, which was charged to the Government as an indirect cost. Raj Shah routinely cashed out 100% of his PTO despite frequently being out of the office to attend medical appointments and procedures to treat his heart condition and other chronic illnesses.

167.     For example, on or about March 28, 2016, Raj Shah emailed Miten Shah, requesting the dollar value of his PTO for that calendar year. After being informed that his PTO that year was $174,446, Raj Shah replied "Thank you. Now I can sign on [the] house[,]" referring to a new home that the Shahs' recently built in Great Falls, Virginia.

25

168.    Raj Shah also arranged for large PTO and bonus payments to his wife and daughter, Nupur Shah, just before her wedding.

169.    On one occasion, Ms. Ezerski raised a concern about Raj Shah's timesheets in an email to Dushyant Lowe, then the CTIS Chief Financial Officer.

170.    Rather than reply in email, Mr. Lowe admonished Ms. Ezerski in a text message: "Yo, don't ask me about Raj timecard jn [sic] email pls.  We can't put this kind of stuff in email . . . I am deleting.  You do the same."

171.    After Ms. Ezerksi confirmed she would delete the email but that she still "need[ed] guidance[,]" Mr. Lowe promised he would provide that guidance face-to-face so as to avoid documentation of the conversation.  During that meeting, Mr. Lowe instructed Ms. Ezerski that Raj Shah's timecards would continue to show eight hours worked each day, charged to Task Order, Grant, or G&A, regardless of whether Raj Shah actually performed those hours.

172.    Raj Shah also exploited CTIS to further enrich himself by issuing sham loans to the company that it would repay at interest rates of 14%–15%.

173.    Upon information and belief, Raj Shah also caused CTIS to issue bonuses of $5,000 per month to Mehul Shah.  These bonuses were not in fact intended for Mehul Shah, and instead were intended for Bharti Shah, which is why the bonuses were paid into a jointly held account.  The bonuses were paid in Mehul Shah's name to reduce the tax burden to Bharti Shah, even though the bonuses were in truth and in fact intended for, and received by, Bharti Shah.

> **b.    The Shahs, Through CTIS, Knowingly and Fraudulently Charged the Government for Salaries for the Shah Daughters and A Family Friend Even Though They Performed No Work for CTIS.**

174.    Raj Shah also arranged for each of his daughters to draw a salary from CTIS, despite not performing any actual work on behalf of the company.  The salaries were billed to

CTIS as G&A or overhead. CTIS, acting at Raj Shah's direction, knowingly and intentionally passed these claims to the Government through invoices claiming indirect costs even though no work for CTIS was performed by Raj Shah's daughters.

175.    For example, Raj Shah's youngest daughter, Nupur Rivera, was given an administrative title, with purported responsibilities of drafting and reviewing grants, and a salary of over $60,000 while she was in nursing school at The George Washington University.

176.    During this time, Nupur Rivera did not perform any actual work for the company, and instead would generally arrive at the worksite only during class breaks to have lunch with her father.

177.    Raj Shah arranged for her salary to be charged as overhead, which was passed along to the Government as an indirect cost. All invoices containing the costs of Nupur Rivera's salary were knowingly false submissions for work that was not performed.

178.    To create the false appearance that Nupur Rivera actually worked for CTIS, Raj Shah would occasionally copy her on email traffic relating to grant applications. However, she never weighed in on those discussions, either on the email chain or in person, because her role was fictitious and fabricated as a means to provide her an annual salary.

179.    To further create the false appearance that Nupur Shah was performing tasks, CTIS, at Raj Shah's direction, "drafted a template [time-keeping sheet] for [her] to fill-in the monthly activities." CTIS then instructed her to fill in the sheet with "items from [another employee's] task list."

180.    After Nupur Rivera graduated and began actual employment as a nurse practitioner with another out-of-state organization, Raj Shah was forced to remove her from the payroll.

181.    Before doing so, he directed Mr. Lowe to provide her severance and a bonus.  Mr. Lowe then emailed Ms. Ezerski and the Human Resources Manager stating "we need to fix severance paperwork.  [H]as to be 1 month severance and 3 month bonus[.]"

182.    Sunita Shah-Walter, Raj Shah's eldest daughter, also earned a salary—over $98,000—from CTIS for an administrative position that she did not actually perform.

183.    Sunita Shah-Walter "worked" for CTIS at the same time she was in Cambridge, Massachusetts earning a Ph.D. from Harvard University.

184.    Raj Shah also "employed" his middle daughter, Rina Shah, through fictitious expenses reports that she would submit monthly in the amount of $2,000.

185.    Raj Shah paid Rina Shah through expense reports to avoid taxes on that income, as well as to avoid jeopardizing her existing federal employment, which at the time prohibited her from being employed in the private sector.

186.    Rina Shah's purported job responsibilities were actually performed by Ms. Ezerski.

187.    All of the Shah daughters' salaries were charged to CTIS as G&A or overhead. CTIS then, at the direction of Raj Shah, knowingly submitted false claims for work that the daughters did not perform by invoicing the Government for indirect costs which included those salaries.

188.    After being awarded the TCC Grant, Raj Shah also arranged for his friend and CTIS Board Member to assume a salaried position with CTIS as the TCC Grant's Primary Investigator ("PI").

189.    The PI earned approximately $30,000 per month for this position, which was charged directly to the TCC Grant.

28

190.     Despite billing time to the TCC Grant, the PI had little or no actual job responsibilities. Instead, the Vice President of Public Health and Research Services, and Program Director for the TCC Grant, assumed the project responsibilities. She was instructed to submit fraudulent timesheets that falsely represented that he worked hours that he did not.

191.     CTIS was aware that these timesheets were false, but under the direction of Raj Shah, paid the PI a salary drawn directly from the TCC Grant.

192.     On or about March 22, 2016, the CTIS Vice President and the TCC Grant's Program Manager, vented about the PI's fraudulent charges in a text message to Ms. Ezerski:

> Connie I am frustrated beyond belief. How is it that last night you don't know you have to go to a funeral and then today you have to speak at two funerals??? That man is a liar. I deal with it all the time. He tells me he's at CTIS when he's not. He will say he's at meetings at NIH when he's not. He is a liar who doesn't like to work but gets paid $30K a month while I kill myself literally keeping the program going . . . That man is a lying crook whose only good intentions are for his own pockets. Thank God I have a good relationship with the officials at NIMHD because I believe he has rubbed them the wrong way. They don't even return his phone calls or emails. They contact me instead. I am starting to feel really overwhelmed like I need to consider other options. It makes me sick to see how he lies, and robs the company and the grant . . . Mr. M and I get along fine because I play the part very well....but it's killing me inside.

193.     Upon information and belief, Defendants continue to pay the PI a salary, charged directly to the TCC Grant, for work that he does not perform. All debits from the grant for the PI's salary are knowingly false claims for work that was not performed.

## C.     The Shahs, Through CTIS, Violated the False Claims Act by Fraudulently Subcontracting with Related, Pass-through Entities.

194.     CTIS, acting at the direction of Raj Shah, also passed along fraudulent charges to the Government arising from subcontracts with related entities that did not actually perform work.

195.     One such entity was RAYS Technologies, Inc. ("RAYS"), which was owned by Raj Shah's nephew and effectively controlled by the Shahs.

29

196.     CTIS subcontracted with RAYS to perform IT services in support of CTIS's government contracts. RAYS rarely performed this work, which was often performed in-house by CTIS personnel.

197.     In one such instance, CTIS paid RAYS $890,000 to perform website work related to several of CTIS's government contracts.  This work was not performed by RAYS, and was actually performed by CTIS.

198.     Even though RAYS did not perform any of the website work, CTIS issued checks to RAYS on the dates, and in the amounts, as follows:

| | |
|---|---|
| December 18, 2011: | $275,000 |
| December 30, 2011: | $300,000 |
| May 13, 2012: | $315,000 |

199.     At Raj Shah's direction, these false charges were passed on to the Government by CTIS either as a direct cost or through indirect cost charges.

200.     To create the appearance that RAYS was a legitimate entity, CTIS and Raj Shah created phony statement of work agreements between CTIS and RAYS.  The work that was the subject of the agreements frequently had been, or would be, performed exclusively by CTIS personnel.

201.     At the direction of Raj and Bharti Shah, CTIS also created fraudulent RAYS invoices and passed the charges along to the Government.  Raj Shah would direct staff to stay late, sometimes overnight, to create false documentation supporting those charges.

202.     For example, on or about September 14, 2015, Raj Shah arranged for an invoice from RAYS to be charged to the CTEP Task Order for work RAYS did not perform.

30

203.    Even though CTIS had been performing the CTEP Task Order for only a few days at that time, Raj Shah directed RAYS to charge approximately $300,000 directly to the Task Order.

204.    This charge came as a surprise to the CTEP Task Order Program Manager, Sudhir Raju, who knew that RAYS had not performed any such work for the Task Order.

205.    Furious about the false charges, Mr. Raju asked Ms. Ezerski why Raj Shah charged $300,000 to the CTEP Task Order.  Ms. Ezerski stated she had no idea why Raj Shah charged that amount, and she then advised Mr. Raju to speak with Raj Shah directly.

206.    Mr. Raju then attempted to engage CTIS's external auditors about the billing practices.

207.    After learning about Mr. Raju's efforts, on or about September 15, 2015, Raj Shah emailed Mr. Raju to arrange a meeting to talk Mr. Raju out of reporting the misbilling.

208.    Upon information and belief, CTIS never reimbursed the Government for the fraudulent $300,000 charge.

209.    Surini, Inc. ("Surini") was another shell company that Raj and Bharti Shah established.

210.    Surini had no employees and was simply a pass-through vehicle through which the Shahs, through CTIS, would inflate the costs for which they would seek reimbursement from the Government.

211.    As with RAYS, CTIS created the appearance of a legitimate relationship by creating phony statement of work agreements and revenue-sharing agreements between Surini and CTIS.

212.    The tasks described in the agreements were in fact performed by CTIS.

31

213. The purpose of RAYS and Surini was to allow CTIS to earn additional, hidden profits on work that the CTIS personnel actually performed.

214. Referencing his use of shell entities that did not perform actual services, Raj Shah once remarked to Ms. Ezerski, "if you ever wanted to get me into a lot of trouble, you really could."

215. Upon information and belief, the Shahs used multiple other shell companies that did not perform any actual services, either as a means to artificially inflate their profits under the contract, or to conceal money to avoid taxes. These shell companies include 501(c)(3) organizations such as the iBharti Foundation, as well as Rax Trading Company to whom Raj and Bharti Shah caused Surini to wire $217,000 in or around June 2013.

**D.     The Shahs, Through CTIS, Violated the False Claims Act by Fraudulently Inducing the Government to Award the $15 Million TCC Grant to CTIS by Promising a Post-Government Career to Defendant Ruffin and Submitting False or Fraudulent Claims for Payment from the Grant for Dr. Ruffin's Consulting Fees.**

216. On or about November 16, 2012, NIHMD issued a notice of intent to award a grant. The grant notice incorporated the terms and conditions described in the NIH Grants Policy Statement ("Statement"). Section 2.36 of the Statement provided that "Applicants for and recipients of NIH grant funds . . . must adhere to all applicable Federal statutes, regulations, and policies[.]"

217. CTIS, however, ultimately acquired the TCC Grant by fraudulently inducing its award from the Government in violation of federal criminal anti-bribery and conflict of interest laws, such as 18 U.S.C. §§ 201 and 208. CTIS did so by intentionally bribing the then-NIMHD Director, Defendant Ruffin, with the promise of post-government employment with CTIS and a six-figure salary funded by the Grant.

32

218.    In exchange for the promise of lucrative post-government employment, Dr. Ruffin agreed to provide CTIS with feedback on its draft application to tailor it to be more favorably received by the application evaluation committee, of which Dr. Ruffin was a member.

219.    On or about November 4, 2012, after the award decision was delayed to the following year to allow for resubmissions of applications, Dr. Ruffin emailed Raj Shah concerning the Defendants' application and stated: "We need to talk if you plan to resubmit."

220.    Raj Shah replied that he "definitely want[s] to resubmit" but questioned whether they "need[ed] to meet[.]" Dr. Ruffin advised Shah that an in-person meeting "might be better!"

221.    Following Dr. Ruffin's request, Raj Shah and Dr. Ruffin met during multiple closed-door sessions at CTIS to discuss the TCC Grant application.

222.    Days later, Raj Shah instructed his administrative assistant, Ashley Lanton, to discretely meet Dr. Ruffin in an alley behind the NIMHD offices.

223.    During the back-alley meeting, Dr. Ruffin gave Ms. Lanton a sealed package that, upon information and belief, contained Dr. Ruffin's comments on the draft application.  Ms. Lanton delivered the sealed package to Raj Shah, who directed the CTIS grant team to review and incorporate Dr. Ruffin's suggestions.

224.    On or about January 11, 2013, four days before submissions were due, Raj Shah sent Dr. Ruffin a revised version of the grant application.

225.    On or about January 14, Dr. Ruffin asked Raj Shah to "give [him] a call" to discuss the draft.

226.    Upon information and belief, Dr. Ruffin offered additional comments on that call to improve CTIS's chance of award.

33

227.    Following the call, Raj Shah emailed Dr. Ruffin stating that the PI "went over [Dr. Ruffin's] comments with [the] team and changes [to the application] are being made."

228.    Dr. Ruffin responded, stating "we are here for you.  This I will make sure of." Raj Shah forwarded the email chain to Ms. Ezerski, instructing her "not to share with anyone."

229.    Ultimately, NIMHD awarded the TCC Grant to CTIS.

230.    Upon information and belief, NIMHD would not have awarded the TCC Grant to CTIS but for then-NIMHD Director Ruffin's covert and illegal participation in CTIS's grant application.

231.    In or around June 2013, employment discussions between CTIS and Mr. Ruffin stalled.

232.    Dr. Ruffin wanted his employment agreement to be with CTIS, while Raj Shah stated that one of his "current main concern[s]" was that "[w]e can not [sic] have Ctis reference" in any employment agreement.

233.    Raj Shah suggested instead that the employment agreement be with Surini, one of CTIS's shell companies.

234.    Dr. Ruffin argued that Surini's minimal assets did not provide him the income security that an agreement with CTIS would, and that the "perceived conflict relative to CTIS contract bids" could be "managed."

235.    Raj Shah also considered paying Dr. Ruffin an additional $150,000 "a year as shadow president" for CTIS because "NIMHD is his grant and any savings with me billing about $150K I am happy to give him as a swap."

236.    Eventually, by August 2013, CTIS agreed to compensate Dr. Ruffin for his assistance in obtaining the grant by retaining Dr. Ruffin's consulting firm, ConsulStart.

237.    The terms of the agreement required the Defendants to pay Dr. Ruffin's consulting firm $200,000 annually.

238.    Despite drawing funds directly from the Grant, ConsulStart was not providing any actual services in support of CTIS.

239.    The payments were made to ConsulStart from the TCC Grant funds, and the debits from the Grant proceeds were false or fraudulent because they effectively sought reimbursement to pay bribes to Dr. Ruffin.  Moreover, the debits were also false or fraudulent because ConsulStart did not perform any actual services in support of the TCC Grant.

240.    In addition, the CTIS grant application certified that CTIS was, and would, comply with all applicable federal laws and regulations.  This certification was false because the Defendants conspired to rig the award of the grant by directing it to CTIS in exchange for lucrative post-government employment for the then-NIMHD Director, Dr. Ruffin.  The Defendants' manipulation of the Grant-award process violated several federal anti-bribery and conflict of interest laws.

## E.    Raj Shah, Through CTIS, Submitted False Claims to the Government by Falsely Certifying that CTIS Maintained Protected Health Information in Accordance with the Data Security Requirements in the Task Order and Grant.

241.    CTIS, acting at the direction of Raj Shah, did not actually maintain the protected health information ("Protected Information") in accordance with HIPAA, the HIPAA Privacy Rule, or the data security requirements in the CTEP Task Order.

242.    CTIS's failure to safeguard Protected Information was a source of concern to  the CTIS NCI/CTEP Senior Client Specialist. ("Specialist").  The Specialist repeatedly expressed concern verbally and in writing to, her manager, the IT Department, and Human Resources, that

35

CTIS was maintaining sensitive data on unsecured, outdated Windows XP 2003, which could easily be hacked.

243.    Each claim for payment under the CTEP Task Order certified that CTIS was in compliance with its data security requirements under the CTEP Task Order.

244.    In practice, CTIS was not complying with the data security requirements, and instead stored data on an unsecured operating system.  The Government was unaware of this fact because CTIS removed its storage system from a cloud storage to which the Government had access.

245.    For each claim, at the time it was submitted, CTIS and Raj Shah knew that CTIS was actually not compliant with its data security requirements under the Task Order.  CTIS, acting at the direction of Raj Shah, nonetheless knowingly and falsely certified that CTIS was properly maintaining and securing the Protected Information.

246.    The Grant application also certified that CTIS would maintain Protected Information in accordance with the Grant security requirements.

247.    At the time CTIS submitted the application, CTIS and Raj Shah knew that CTIS was not maintaining and securing Protected Information in accordance with those requirements. CTIS and Raj Shah also did not intend to maintain and secure Protected Information if awarded the Grant.

248.    CTIS, acting at the direction of Raj Shah, nonetheless knowingly and falsely certified that CTIS was properly maintaining and securing the Protected Information when it submitted the Grant application.

## COUNT I
## VIOLATIONS OF THE FALSE CLAIMS ACT – 31 U.S.C. § 3729(a)(1)(A)

249.    The allegations of ¶¶ 1–248 are realleged as if fully set forth herein.

36

250.    By virtue of the acts described above, the Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States Government, and knowingly failed to disclose material facts, in order to induce Government payment or approval.

251.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT II
## VIOLATIONS OF THE FALSE CLAIMS ACT – 31 U.S.C. § 3729(a)(1)(B)

252.    The allegations of ¶¶ 1–251 are realleged as if fully set forth herein.

253.    By virtue of the acts described above, the Defendants knowingly made, used, or cause to be made or used, false records and statements, and omitted material facts, to the United States Government in order to induce the Government to pay or approve false and fraudulent claims.

254.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT III
## VIOLATIONS OF THE FALSE CLAIMS ACT – 31 U.S.C. § 3729(a)(1)(C)

255.    The allegations of ¶¶ 1–254 are realleged as if fully set forth herein.

256.    By virtue of the acts described above, the Defendants conspired to defraud the United States by inducing the Government to pay or approve false and fraudulent claims for payment or approval to the United States Government.  The Defendants, moreover, took substantial steps in furtherance of the conspiracy, *inter alia*, by making fraudulent representations, by preparing fraudulent records, and by failing to disclose material facts to the United States.

257. By reason of these payments or approvals, the United States has been damaged, and continues to be damaged, in a substantial amount.

**WHEREFORE**, Relator Connie Ezerski, on behalf of herself and the United States of America, prays:

A. That the Court enter judgment against the Defendants, jointly and severally, in the amount equal to three times the amount of damages the United States sustained because of their actions, plus a civil penalty for each false claim;

B. That the Court enter judgment on Ms. Ezerski's behalf in the amount of 25% of the proceeds of this action if the United States elects to intervene, and 30% of the proceeds if it does not;

C. That the attorney fees, expenses, and costs incurred on behalf of Ms. Ezerski be paid by the Defendants; and

D. That the United States and Relator receive all legal and equitable relief to which they may appear entitled.

Respectfully submitted,

Ari Meltzer
Stephen J. Obermeier (*pro hac vice* pending)
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006
202.719.7000

DATE: February 16, 2018

38